JACQUELINE WATKINS,                    )
                                       )
            Plaintiff,                 )        No. 17-cv-02028
                                       )
     v.                                )
                                       )        Judge Edmond E. Chang
CITY OF CHICAGO,                       )
                                       )
            Defendant.                 )

## MEMORANDUM OPINION AND ORDER

Jacqueline Watkins is a Chicago Police Officer who brings this Title VII employment discrimination case, 42 U.S.C. § 2000e *et seq*., against the City of Chicago.[1] R. 18, Am. Compl.[2] According to Watkins, the Chicago Police Department discriminated against her on the basis of race and gender and then retaliated against her when she complained about the discrimination. The City has moved for summary judgment. R. 89. For the reasons explained below, the motion is granted.

## I. Background

The facts narrated below are undisputed unless otherwise noted (and if disputed, the evidence is viewed in Watkins's favor).[3] Jacqueline Watkins has been

---

[1]The Court has federal question jurisdiction over this case under 28 U.S.C. § 1331.

[2]Citation to the docket is "R." followed by the entry number and, when necessary, the relevant page or paragraph number.

[3]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for the City's Statement of Facts [R. 90] and "Pl.'s Resp. DSOF" for Watkins's response to the City's Statement of Facts [R. 103]. As the City points out, though, Watkins did not file a separate Statement of Additional Facts with her response to the motion for summary judgment. Instead, Watkins appears to have interspersed her new facts into her response to the City's Statement of Facts. In addition, Watkins's response to the DSOF contains numerous facts not supported by any record citation.

employed by the Chicago Police Department as a Police Officer since 1999. DSOF ¶ 1. Officer Watkins is an African-American woman. *Id*.

## A. Complaint Registers

In September 2008, Watkins was on patrol with her partner, Officer Harriet White, who is also an African-American woman. DSOF ¶ 5. Watkins and White were part of the third-watch shift in the CPD's 22nd District. *Id*. The third watch was staffed by around ten officers, including Watkins and White, and was supervised by Sergeant Francis Higgins. *Id*. ¶ 6.

The third-watch patrol ran from 4 p.m. to midnight. DSOF ¶ 5. At around 11:25 p.m. on September 9, 2008, Watkins and White had just finished up a suspicious-person call and reported to dispatch that they were "clear." *Id*. ¶ 7. A report of "clear" means that the officers are available to respond to new calls. *Id*. ¶ 8. If an officer is not available to respond to calls for whatever reason, then the officer is supposed to report that they are unavailable. *Id*.

---

Federal courts may enforce their local rules, such as Local Rule 56.1, even as to *pro se* litigants like Watkins. *See e.g.*, *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006); *Greer v. Board of Educ. of City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001). To be sure, the Court still views Watkins's *pro se* filings as expansively as reasonably possible, and she still gets the benefit of viewing the evidence in the light favorable to her. But to the extent that Watkins has alleged facts without any evidentiary support (whether explicitly cited or readily located in the record by the Court), the Court cannot credit them for purposes of this motion.

As for Watkins's additional facts, even though Defendants are correct in that she failed to file a separate statement of additional facts, the Court will nonetheless construe any *supported* facts that she includes in her response to the DSOF as one of her additional facts. The City helpfully picked out Watkins's new facts and placed them in a separate document (along with the City's responses), so the Court will go ahead and construe that document as "Def.'s Resp. PSOF," for the City's response to Watkins's Statement of Additional Facts [R. 109].

That night, White was driving; Watkins was in the passenger seat. DSOF ¶ 5. At 11:35, ten minutes after Watkins and White had reported themselves "clear," dispatch sent out a priority one call for a burglary in progress. *Id.* ¶ 10.

What happened next is disputed. According to the City, "priority one" means that the call is urgent, and *all* available officers must respond immediately. DSOF ¶ 11. As Sergeant Higgins was en route to respond to the burglary-in-progress call, he saw Watkins and White driving in the opposite direction from the burglary scene. *Id.* ¶ 12. At that point, Higgins called dispatch to report Watkins and White. *Id.* ¶ 13. Specifically, at 11:36 p.m. (one minute after the burglary call was made), Higgins placed a call to dispatch in which he asked dispatch to order Watkins and White to "turn around and head with me to that burglary in progress." *Id.* Accordingly, the dispatcher called Watkins and White; there was a pause with no reponse; and the dispatcher asked them if they copied. *Id.* Higgins eventually arrived at the scene of the burglary. *Id.* ¶ 14. Four minutes later, Watkins and White showed up. *Id.*

Watkins tells a different story. According to Watkins, the 11:35 p.m. burglary-in-progress call did not require all available officers to respond immediately. R. 100, Pl.'s Resp. DSOF ¶ 10. Rather, dispatch specifically assigned the call to a different beat car, not to Watkins and White. *Id.* As a result, Watkins disputes that she was required to immediately respond to the call. *Id.* Nonetheless, Watkins does not dispute that Higgins placed a call to dispatch to ask dispatch to instruct Watkins and White to respond to the burglary call. *Id.* ¶ 11. According to Watkins, Higgins was merely singling them out "in a hostile tone." *Id.* Even so, when dispatch relayed

Higgins's orders to Watkins and White, Watkins asserts that they immediately responded to the assignment at that point. *Id.* ¶¶ 11-12. Watkins does not dispute that when she and White arrived at the scene of the burglary, Higgins was already there. *Id.* ¶ 14. But Watkins asserts that it only took them "a few seconds, a minute or less," to show up, not four minutes. *Id.* In short, Watkins maintains that they did not immediately respond to the burglary-in-progress call because it had been assigned to a different beat car, but when dispatch later assigned the call to Watkins and White, they immediately responded. The bottom line, according to Watkins, is that she and White did not break any rules that night.

In any event, it is undisputed that a few hours after this incident, Sergeant Higgins filed what is called a "complaint register" (CR) against Watkins and White. DSOF ¶ 15; R. 90, DSOF, Exh. 10, Rivera Decl., Exh. C, Investigation Records at DEF-WAT 000493.[4] To provide some background, a CR is the first step in initiating potential discipline against a police officer. DSOF ¶ 30. A member of the public can file a CR against a CPD employee, or, as in this case, a CPD employee can file a CR against a fellow employee. *Id.* ¶ 31. When a CR is filed, as pertinent here, it is handled by the Internal Affairs Department (IAD); IAD assigns each CR a log number and

---

[4]The investigation records for both Higgins's CR against Watkins and Watkins's discrimination allegations against Higgins are provided as Exhibit C to Sergeant Juan Rivera's Declaration, which is in turn attached as Exhibit 10 to the DSOF. The investigation records encompass the original complaints written by Higgins and Watkins; the dispatch phone records from September 9, 2008; Sergeant Kane's interview transcripts with Higgins, Watkins, and White; Sergeant Kane's summary report; and other relevant letters and documents. The individual documents are not broken down into their own exhibits. So, for the sake of simplicity, from here on out, the Opinion will simply cite all of these documents as "Investigation Records" and will identify the specific page or pages by the "DEF-WAT" Bates number provided by the parties.

then assigns a staff member to investigate the allegations in the CR, create a summary of findings, and recommend discipline (if appropriate). *Id*. ¶ 32. IAD can issue one of four possible findings for a CR: (1) sustained, which means there was sufficient evidence to support the allegation of misconduct; (2) not-sustained, which means there was not sufficient evidence to support the allegation; (3) unfounded, which means the alleged misconduct did not occur; and (4) exonerated, which means the alleged conduct did occur but was actually not a rule violation. *Id*. ¶ 33.

Here, Higgins initiated the CR process by filing an internal memorandum in which he detailed how Watkins and White, "in spite of ample time and space to make a U-turn," drove "AWAY from an all call assignment." DSOF ¶ 15; Investigation Records at DEF-WAT 000493 (capitalization in original). Higgins did not dispute Watkins's assertion that the burglary call was initially assigned to a different beat. *See* Investigation Records at DEF-WAT 000493. But Higgins maintained that Watkins and White were still supposed to respond, because the call was an "all call assignment," which presumably means that even though it had been specifically assigned to a beat car, all other available units were still expected to respond. *Id*. At the top of the memorandum, Higgins characterized his allegations as "inattention to duty" and "failure to provide police service." *Id*. It is undisputed that other than this CR against Watkins and White, Higgins never issued any other CRs over the course of his 29-year career. DSOF ¶ 18.

On September 25, 2008, Sergeant Derrick Shinn (also of the 22nd District) notified Watkins that a CR had been opened against her. Pl.'s Resp. DSOF ¶ 17;

Investigation Records at DEF-WAT 000511-12. As mentioned above, Watkins sharply disagreed with the factual basis for the CR (namely, that she failed to respond to a burglary call). So, a week later, on October 2, 2008, Watkins wrote her own internal memorandum alleging that Higgins made a false report against her simply because she was a Black woman. DSOF ¶ 21; Investigation Records at DEF-WAT 000489-90. In her memorandum, Watkins alleged that Higgins was motivated by "his own inward racial hatred and prejudice" to "make a false allegation without fact or justification." Investigation Records at DEF-WAT 000490. She called his filing of the CR as an "outward act of discrimination" against herself and White. *Id*.

## B. First IDHR Charge

Around the same time that she filed the memorandum internally with the department, Watkins also attempted to file a charge of discrimination with the Illinois Department of Human Rights (commonly referred to as "IDHR"). DSOF ¶ 68. She filled out an IDHR Employment Complainant Information Sheet, on which she stated that the CPD discriminated against her on the basis of race and gender when Higgins initiated the allegedly false CR against her. *See* R. 90, DSOF, Exh. 15. But according to Watkins, before she could officially file the charge, an IDHR representative named Maryann Pettway told her that "unless there was some punishment or other employment detriment that ensued as a result of this action, the complaint could not be filed and investigated." DSOF ¶ 69; Pl.'s Resp. DSOF ¶ 69. As a result, Watkins did not file the IDHR charge. DSOF ¶ 69.

## C. Internal Review of Complaints

Meanwhile, the CPD's internal review process for the two complaints—the inattention to duty CR that Higgins filed against Watkins, and the discrimination CR that Watkins filed against Higgins—was just getting started. This process would ultimately go through multiple layers of review and would last six years.

The first person to review the complaints was Sergeant Derrick Shinn. (Shinn was just another member of the 22nd District and was not a member of IAD.) The record shows that Sergeant Shinn was first assigned the case on September 16, 2008. *See* Investigation Records at DEF-WAT-000487. (This was before Watkins accused Higgins of discrimination.) On that date, a "complaint log number" of 1019842 was assigned to Higgins's CR against Watkins. *Id*. at DEF-WAT 000494. Then, on October 2, Shinn received Watkins's complaint of discrimination against Higgins. *Id*. As far as the record shows, Watkins's complaint was not assigned a separate log number. Rather, it appears to have been consolidated with Higgins's existing log number, although Watkins maintains that this shows the City never bothered to assign her CR its own number. Pl.'s Resp. DSOF ¶ 34. A week later, on October 10, Sergeant Shinn noted that he ultimately "found no evidence during [his] investigation to support this allegation against Sgt. Higgins." Investigation Records at DEF-WAT 000487. On that same day, Shinn transferred the entire case number (encompassing both the allegations against Watkins and the allegations against Higgins) to IAD, because IAD was responsible for investigating all discrimination allegations. *Id*.

When CR No. 1019842 reached IAD in November 2008, it was assigned to Sergeant Jamie Kane for review. DSOF ¶ 34; Investigation Records at DEF-WAT 000485. This meant that Kane would be responsible for investigating both the inattention to duty allegations as well as the discrimination allegations. DSOF ¶ 34. It is undisputed that as part of this investigation, Kane interviewed Higgins, Watkins, and White and also reviewed the dispatch audio recordings from September 9, 2008 (the night of the burglary call) and other documents from that night. *Id*.

Specifically, Kane conducted two interviews with Watkins on April 28, 2010. Investigation Records at DEF-WAT 000528-31, DEF-WAT 000534-37. It is unclear why these interviews took place nearly a year and a half after the complaints were assigned to Sergeant Kane. During the first interview, Kane asked Watkins about the September 9, 2008 burglary-in-progress call. *Id*. at DEF-WAT 000528-31. Watkins explained that when she and White heard the original dispatch for the burglary call, they made a U-turn to drive toward the job. *Id*. at DEF-WAT 000530. But apparently they did not turn fast enough for Sergeant Higgins, who "went over the air in a nasty tone, to tell [Watkins and White] to turn around." *Id*.

The second interview that afternoon focused more on Watkins's discrimination allegations against Higgins. According to Watkins, Higgins could have easily addressed any issues he had with her on the scene of the burglary. Investigation Records at DEF-WAT 000535. Instead, he went "to the extreme level of obtaining the slanderous CR number and automatically going into the [stereotype] of black female officer, of assuming lazy, inefficient, and trying to avoid work." *Id*. Watkins also

mentioned that she observed that when a white officer had an issue, Higgins would simply discuss it with them as opposed to filing a CR. *Id*. She could not point to any specific white officers, but remarked that Higgins was generally "friends with all of the white officers." *Id*. at DEF-WAT 000536. Watkins also mentioned that she heard from two other Black female officers, one named Sheila Fulks and the other named Linda (the last name was not identified), that Sergeant Higgins had also disciplined them in more extreme ways: for Fulks, Higgins had allegedly put his hand on her back, pushed her, and told her to get to roll call once when she was late, and for Linda, he spoke to her supervisor when she was late to an assignment. *Id*. Watkins also accused Higgins of making racist remarks generally. For instance, according to Watkins, when they were dealing with Black suspects, Higgins would tell the Black officers to "get your cousins." *Id*. Higgins would also apparently say "wake up" whenever he tried to communicate to officers (though it is not clear if this was to all officers or just Black officers). *Id*.

Watkins later asserted that the transcripts do not capture the entire interview exchange. Most notably, Watkins claims that during one of her interviews with Kane, she accused Sergeant Higgins of being a racist, and in response, Kane "was like you're defaming his reputation." R. 90, DSOF, Exh. 3, Watkins Dep. Tr. at 92:14-18.[5]

---

[5]Watkins describes this encounter in much stronger language in her response brief. Specifically, Watkins asserts that Kane actually "yelled" at her and stated "how dare you ruin this man reputation with this discrimination allegation." Pl.'s Resp. Br. at 3. But that statement in the response brief is not accompanied by any record cite. The only place in the record that seems to support this fact is Watkins's deposition transcript cited above. *See* R. 90, Exh. 3, Watkins Dep. Tr. at 92:14-18. But because the deposition transcript does not support either the allegation that Kane "yelled" at Watkins, or the allegation that Kane said

After the two interviews with Watkins on April 28, 2010, Kane then interviewed Sergeant Higgins that same afternoon. Investigation Records at DEF-WAT 000519-21. Higgins largely reiterated the allegations in his original complaint register, and further noted that he did not remember if he spoke to Watkins and White at the scene of the burglary because he "was busy." *Id.* at DEF-WAT 000521. The next month, in May 2010, Kane also interviewed White. *Id.* at DEF-WAT 000538-41, DEF-WAT 000545-46. White mostly corroborated Watkins's version of events from the night of the burglary call. White remembered hearing the dispatcher issuing the burglary call, then calling out their beat, and then Watkins and White made a U-turn and drove toward the assignment. *Id.* at DEF-WAT 000540. According to White, it took them less than 30 seconds to arrive at the call. *Id.* at DEF-WAT 000541.

In November 2010, Sergeant Higgins retired from the Department. DSOF ¶ 6. According to Watkins, he was "allowed to retire in good standing" despite her pending discrimination claims against him. Pl.'s Resp. DSOF ¶ 17.

Finally, in October 2011, Sergeant Kane produced an eight-page summary report of her findings. Investigation Records at DEF-WAT 000471-79. In the summary report, Kane laid out the arguments made by Higgins, Watkins, and White and then Kane described what she heard on the audio recording of the pertinent dispatch calls. Specifically, Kane determined that, based on her impression of the audio recording, the sequence of events happened like this: (1) at 11:35 p.m., the dispatcher announced the burglary-in-progress call and assigned it to a different beat

---

the words "how dare you ruin this man['s] reputation," the Court cannot accept those allegations just from the response brief.

car, and that beat responded with "10-4"; (2) at 11:36:20, Higgins came on air and told the dispatcher to "tell [Watkins and White] to turn around and head with me to the burglary in progress"; (3) the dispatcher called Watkins and White; (4) there was a pause with no response; (5) the dispatcher asked "do you copy"; (6) Watkins and White responded. *Id.* at DEF-WAT 000474-75. Based on those findings, Kane ultimately "sustained" the allegations against both Watkins and White (which means she found sufficient evidentiary support for them), and then recommended a two-day suspension for Watkins and a one-day suspension for White. *Id.* at DEF-WAT 000479. Kane was not persuaded by the discrimination allegations against Higgins. *Id.* at DEF-WAT 000477.

The next step in the review process was to send Kane's summary report up the chain of command. Under this "Command Channel Review" process, Kane's findings would be reviewed by various CPD supervisors, who would each issue their own recommendations. R. 90, DSOF, Exh. 10, Rivera Decl. ¶¶ 13-14. Afterwards, the case would then make its way up to the IAD Chief, who at the time was Sergeant Juan Rivera, and finally the CPD Superintendent, Garry McCarthy. DSOF ¶¶ 37-38. Superintendent McCarthy would ultimately have the authority to decide whether or not to adopt the investigatory findings and to issue discipline if applicable. Rivera Decl. ¶ 15.

In this instance, the Command Review process began with Dana Alexander, Eugene Williams, and Al Wysinger. Pl.'s Resp. DSOF ¶ 13. It is undisputed that the three Command Reviewers disagreed with Kane's findings on the burglary call and

opined instead that they believed Watkins and White were not officially assigned to the initial call (at 11:35 p.m.) until the dispatcher specifically called out their beat number (at 11:36 p.m.). Rivera Decl. ¶ 21. At the first Command Review step, in February 2012, Alexander recommended changing the finding from "sustained" to "not sustained." Investigation Records at DEF-WAT 000462-63. Alexander noted that there was no evidence showing when Watkins and White actually arrived on the burglary scene, but contrary to Kane's findings, Alexander never heard a "delay in response" by Watkins and White. *Id.* Then, in June 2012, at the next review step, Eugene Williams simply adopted Alexander's findings and also recommended changing the CR to "not sustained." *Id.* at DEF-WAT 000461. And finally, in June 2012, Wysinger also recommended a "not sustained" finding. Wysinger also noted that there was no actual evidence of what time Watkins and White arrived on the scene and pointed out that "the officers are in error by stating that the dispatcher assigned them to respond to the burglary in progress." *Id.* Ultimately, however, because Wysinger concluded that they did eventually respond, he recommended not sustaining the CR. *Id.*

In June 2012, the case reached IAD Chief Juan Rivera. (Rivera would be the final layer of review before the case went up to Superintendent McCarthy.) According to Rivera, he looked at the original CRs, the printout of the dispatch audio records, Kane's summary report, and the Command Review findings. Rivera Decl. ¶ 22. It is unclear if Rivera himself listened to the actual audio recording of the dispatch call. Rivera acknowledged that three of the Command Reviewers had disagreed with the

initial "sustained" recommendation, but based on his own review, he ultimately agreed with Kane's findings. *Id.* ¶¶ 21-22. Specifically, Rivera noted that whereas the Command Reviewers did not believe Watkins and White had been assigned the call until the dispatcher specifically called out their beat, Rivera himself believed that they should have responded immediately when the call went out at 11:35 p.m. *Id.* ¶ 22. Rivera ultimately recommended that Watkins be suspended for one day. DSOF ¶ 40; Rivera Decl. ¶ 25.

Finally, the case file went up to Superintendent Garry McCarthy for review. In February 2014, McCarthy accepted Rivera's recommendations, Rivera Decl. ¶ 30, and in March 2014, Watkins was officially suspended for one day, R. 103-2, Pl.'s Resp. DSOF, Exh. 1 at 13.

### D. Second IDHR Charge

After receiving the one-day suspension, Watkins again tried to file a charge of discrimination with the IDHR. This time she was successful. DSOF ¶ 70. In the 2014 IDHR charge, Watkins alleged that the one-day suspension was both discriminatory and retaliatory. *See* R. 18-1, Am. Compl., Exh. 1. The IDHR ultimately found in favor of the City, and the EEOC adopted the IDHR's finding. DSOF ¶ 71. Watkins received a notice of right to sue from the EEOC in December 2016 and filed this lawsuit on time. *Id.*

### E. Aftermath of Suspension

In addition to filing the charge of discrimination with the IDHR, Watkins also continued to fight the suspension through her union. DSOF ¶ 48. Finally, in

December 2015, an arbitrator ordered the City to change the CR finding against Watkins from "sustained" to "not sustained." *Id.* (Recall that "not sustained" means there was not sufficient evidence to support the allegation, but it does not go so far as to deem the conduct "unfounded" or "exonerated." *Id.* ¶ 33.) The arbitrator also ordered the City to compensate Watkins for the one-day suspension. *Id.* ¶ 48. The City complied with both orders. *Id.*

Despite the reversal of the suspension, Watkins asserts that the damage was done. For one, she alleges that both the CR and the suspension severely hampered her chances at promotion within the Department. DSOF ¶ 49. It is undisputed that out of the two methods for advancement—test scores and merit promotion—merit promotion was the only available avenue for Watkins. *Id.* ¶ 62. What that means is Watkins would have needed to secure a nomination from a commander as well as letters of recommendation from supervisors in order to be promoted. Pl.'s Resp. DSOF ¶¶ 63-64. According to Watkins, she submitted multiple applications for detective positions (as well as maybe sergeant positions), and she also reached out to several supervisors to ask for a recommendation and did not hear back. *See* Pl.'s Resp. Br. at 11, 18; Pl.'s Resp. DSOF ¶¶ 58, 67. Some of these instances definitely occurred in 2016 or later, while the timing of the others is unspecified. Pl.'s Resp. DSOF ¶¶ 58, 67. In addition, Watkins asserts that the process of dealing with the allegedly false CR and suspension caused her immense emotional distress. Watkins Dep. Tr. at 133:24, 134:1-2.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must "view the facts and draw reasonable inferences in the light most favorable to the" non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).[6] The Court "may not weigh conflicting evidence or make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (cleaned up), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

---

[6]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

### III. Analysis

Title VII prohibits employers from discriminating against employees on the basis of "race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a). Title VII also bars employers from retaliating against employees who engage in protected activity under Title VII. *See Poullard v. McDonald*, 829 F.3d 844, 855-56 (7th Cir. 2016). Watkins claims that the City did both. Specifically, Watkins argues that the Chicago Police Department discriminated against her on the basis of her race and sex when Sergeant Higgins filed a false complaint register against her in 2008, and again when she received a suspension in 2014. Watkins also brings a retaliation claim based on that 2014 suspension. At the summary judgment stage, the Court views the evidence in the light most favorable to Watkins and gives her the benefit of all reasonable inferences. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). For the reasons explained below, Watkins has failed to establish either a disparate-treatment claim or a retaliation claim.

### A. Disparate Treatment

To survive summary judgment on the disparate-treatment claim, Watkins must produce evidence that would allow a reasonable jury to find that the City's adverse employment actions against her were motivated by her race or sex. *Ortiz v. Werner Enters. Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) ("The legal standard ... is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action."). The Seventh Circuit has made clear that all

relevant evidence must simply be considered "as a whole." *Id.* at 763. As a practical matter, though, in this particular case there are two main avenues to establishing a disparate treatment claim.

The first option is for Watkins to try to establish a *prima facie* case for discrimination, which requires her to show that (1) she is a member of a protected class; (2) her job performance met the City's legitimate expectations; (3) she suffered an adverse employment action; and (4) the City treated another similarly situated employee who was not a member of the protected class more favorably. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *LaRiviere v. Bd. of Trs. of Southern Ill. Univ.*, 926 F.3d 356, 360 (7th Cir. 2019). If Watkins is able to establish a *prima facie* case, then the burden will shift to the City to provide a legitimate, nondiscriminatory reason for the adverse action. *Coleman v. Donahue*, 667 F.3d 835, 845 (7th Cir. 2012). If the City successfully rebuts Watkins's *prima facie* case, then the burden will shift back to Watkins, "who must present evidence that the stated reason is a pretext, which in turn permits an inference of unlawful discrimination." *Id.* (cleaned up). Alternatively, even if Watkins cannot establish a *prima facie* case, she can still succeed on this claim as long as she points to enough circumstantial evidence that would allow a reasonable jury to infer that a decision was attributable to discriminatory motivations. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Here, Watkins points to two actions by the City that she alleges were discriminatory—the filing of the 2008 complaint register and the 2014 one-day suspension. The City has moved for summary judgment on both those decisions.

## 1. 2008 Complaint Register

Turning first to the 2008 complaint register (CR), the argument here is that Sergeant Higgins filed the CR against Watkins not because she did anything wrong, but rather because of her race and gender. In response, the City claims that the 2008 CR cannot be the basis of any Title VII claim because Watkins failed to file a timely charge of discrimination with the EEOC or IDHR, and even if the claim were timely, she has also failed to establish as a substantive matter that Higgins discriminated against her when he filed the CR.

### a. Timing of the Claim

As a threshold matter, the City argues that any claims stemming out of the 2008 CR should be barred because Watkins failed to file a timely charge with either the Equal Employment Opportunity Commission (EEOC) or the Illinois Department of Human Rights (IDHR). R. 91, Def.'s Br. at 6. Filing a timely charge of discrimination with either the EEOC or the state equivalent (in this case, the IDHR) is a prerequisite to bringing a Title VII claim. 42 U.S.C. § 2000e–5(e)(1); *Moore v. Vital Prods., Inc.,* 641 F.3d 253, 256 (7th Cir. 2011).

Here, it is undisputed that Watkins did not file a charge of discrimination on time. DSOF ¶ 69. Watkins explains that she tried to file an IDHR report right after the CR was initiated back in 2008, but an IDHR representative told her that she was

not allowed to because "unless there was some punishment or other employment detriment that ensued as a result of this action, the complaint could not be filed and investigated."[7] *Id.* ¶ 69; Pl.'s Resp. DSOF ¶ 69. As a result, Watkins waited until 2014, which is when the CR was finally resolved (as a suspension), to try again to file a charge of discrimination. DSOF ¶ 70. Unfortunately, the original IDHR representative's advice was incorrect. There is no rule requiring Watkins to wait for the CR against her to be formally resolved before she is allowed to file a charge alleging that the CR was discriminatorily lodged in the first place. (It is true that an adverse employment action is needed to ultimately win a substantive claim, but it does not appear that an IDHR representative has the authority to refuse to accept a charge.) So, the question is whether some sort of equitable tolling principle might apply to excuse Watson's six-year delay in filing her charge of discrimination due to the faulty advice of the IDHR representative.

Equitable tolling "is reserved for situations in which the claimant has made a good faith error (such as bringing suit in the wrong court) or has been prevented in some extraordinary way from filing his complaint in time." *Threadgill v. Moore U.S.A., Inc.*, 269 F.3d 848, 850 (7th Cir. 2001). As it turns out, however, it is not necessary to resolve the factual issue of whether equitable tolling should apply to a scenario where an IDHR employee communicates an incorrect rule to a plaintiff,

---

[7]The City argues that this evidence should not be considered because it is hearsay. Def.'s Br. at 7. That is incorrect. The statement by the IDHR representative is not being offered for the truth of the matter asserted, but rather for its effect on Watkins.

thereby preventing the plaintiff from filing a charge on time.[8] As the Court will explain in more detail below, Watkins has failed to establish a substantive claim for disparate treatment on the 2008 CR. In other words, the Court takes no position on whether the fact pattern alleged here would have been enough to warrant equitable tolling because the claim must be dismissed either way.

### b. Merits of the Claim on the 2008 CR

As mentioned above, in order to establish a disparate-treatment claim based on the 2008 CR, Watkins must provide enough evidence that would allow a reasonable jury to infer that Higgins only initiated the CR because of Watkins's race or sex. *Ortiz*, 834 F.3d at 765. Here, looking at all of the evidence as a whole, there is simply not enough factual support for a reasonable jury to infer that Higgins filed the CR against Watkins because of her race or sex.

For one, Watkins has failed to satisfy the elements of a *prima facie* case of discrimination, to the extent that she relies on that method of proof. There is a dispute over whether the initiation of a CR counts as a material adverse employment action, as well as whether Watkins's actions on the night of September 9, 2008 satisfied the City's legitimate expectations. But even if the Court were to resolve those disputes in Watkins's favor, the *prima facie* case must fail because Watkins has failed to identify

---

[8]Another issue would have been whether the equitable tolling inquiry should be a bench or a jury question. If Watkins had successfully established a disparate-treatment claim based on the 2008 CR, the Court would have solicited position papers from both parties on the bench or jury question. But again, because the disparate treatment-claim will not survive, there is no need to resolve that issue at this point.

any similarly situated individuals outside of the protected classes who were treated better than her.

The Seventh Circuit has defined "similarly situated" to mean an individual who is directly comparable to the plaintiff in all important ways. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). To be sure, the other employee need *not* be identical to Watkins, nor is there a "mechanical magic formula"—rather, the inquiry is "flexible, common-sense, and factual. It asks essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 895 (7th Cir. 2018) (cleaned up). Some common features are "whether the employees being compared (1) were supervised by the same person, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (cleaned up).

In this case, the best evidence Watkins could have pointed to would have been a white male officer who similarly exhibited a one-minute (or longer) delay in responding to a burglary call (or even a crime of similar urgency). But Watkins does not identify any officer like that, nor does she really identify any comparable officers in general, even when the parameters for what counts as "similar" are loosened. Watkins did mention during her 2010 interview with Kane that she observed white men receiving more lenient treatment from Higgins. Investigation Records at DEF-WAT 000536. But Watkins could not identify who those men were, what they had

done wrong to receive more lenient discipline, or when her observations had happened. *Id*. Instead, Watkins's only conclusion was that there was no specific incident she was thinking of; Higgins just tended to be friends with all the white officers. *Id*. That alone is not enough to satisfy the similarly situated employee requirement for a *prima facie* case.

Nor is the data Watkins cites in her response brief enough to raise an inference of discriminatory intent on Higgins's part. Specifically, Watkins points to CR statistics she pulled from the Citizens Police Data Project website. Pl.'s Resp. Br. at 21-22. But even assuming these statistics are usable in her case, they do not appear to support her claim. Specifically, the statistics purport to illustrate the rate at which CRs were found to be "sustained" or "unsustained" for different racial and gender categories. Watkins argues that a greater percentage of CRs initiated against white men are ultimately "unsustained" compared to the CRs initiated against Black women, which suggests that Black women are disciplined more harshly than white men. *Id*. at 22. But this part of Watkins's disparate-treatment claim is really about the *initiation* of allegedly false CRs in the first place, not their resolution. And here, Watkins has not explained how the rate of sustained versus unsustained CRs speaks to whether those CRs were legitimately initiated in the first place. Nor does the data demonstrate that a greater absolute number of CRs were lodged against Black women compared to white men.[9] *Id*.

---

[9]For these reasons, Watkins's motion to file a sur-reply, R. 115, is also denied. Specifically, Watkins seeks to introduce two new exhibits: (1) another Citizens Police Data Project excerpt and (2) a 2015 letter from the Illinois Attorney General. But even under the more lenient guidelines applied to a *pro se* plaintiff, it would be too much to allow a sur-reply

Looking beyond the *prima facie* framework, Watkins's main argument in support of the 2008 CR being discriminatory is that Higgins harbored implicit biases toward Black women. Pl.'s Resp. Br. at 6. Specifically, Watkins asserts that the only reason Higgins filed the CR was because he believed the stereotype that Black women officers were "lazy, inefficient, and trying to avoid work." Investigation Records at DEF-WAT 000535. The problem is that Watkins does not point to any evidence that Higgins actually held this particular stereotype, or, more importantly, that he acted on that stereotype when he filed the CR. For instance, Watkins attributes words like "lazy" and "negligent" to Higgins throughout her filings, *see* Pl.'s Resp. DSOF ¶ 19, but there do not appear to be any actual citations to the record of Higgins saying those types of things, so the Court cannot credit these assertions.

Similarly, Watkins does offer evidence of other racially related remarks that Higgins made during his career, but there is no indication of when those remarks were made, nor is there any indication that those types of remarks were connected to Higgins's decision to initiate the CR for failure to respond to the burglary call. For instance, during the 2010 interview with Kane, Watkins claimed that when the officers were dealing with Black suspects Higgins would tell the Black officers to "get your cousins." Investigation Records at DEF-WAT 000536. Higgins also apparently said "wake up" on several occasions when he tried to communicate to officers over the radio, though, as mentioned above, it is not clear if this comment was directed only at Black officers. *Id.* The "cousins" comment is especially troubling, but there does

---

based on data that was not identified during discovery and, in any event, is not relevant to the similarly situated individual point, as described above.

not really seem to be a direct connection between Higgins implying that all Black officers are related to Black criminal defendants, on the one hand, and Higgins's alleged perception that Watkins and White were slow to respond to a burglary call, on the other. *See Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) (stray remark might provide inference of discrimination when made in reference to the adverse employment action). Similarly, without knowing when the "wake up" comments were made or who they were directed to, it is difficult to link those words with Higgin's 2008 decision to file a CR. *See Perry v. Dep't of Human Servs.*, 793 F. App'x 440, 442 (7th Cir. 2020) (non-precedential disposition) (stray remark might provide inference of discrimination when made around the same time as the adverse action).

Moreover, even accepting as true Watkins's allegations about the night of the burglary call, it is still undisputed that for at least a short while, Watkins and White were driving in the opposite direction of the assignment; the disagreement is about how long it took for them to turn around. So it was not completely baseless for Higgins to interpret the situation as Watkins and White driving away from the scene of the call and to then place the call to dispatch. Perhaps Higgins was impatient (maybe even unreasonably so), but there is no evidence that he would have been more patient had Watkins not been a Black woman. In other words, the fact that he angrily called in to dispatch does not on its own suggest discriminatory animus.

As for the decision to file the CR itself, the record shows that Higgins sent in his memorandum one day (at the most) after the incident. Investigation Records at

DEF-WAT 000493. Watkins asserts that he should have talked to them at the scene of the burglary or conducted an investigation first instead of jumping straight to the drastic measure of filing a CR; the fact that he did take such a drastic measure, argues Watkins, is evidence of discrimination. Pl.'s Resp. Br. at 12. But again, this decision standing alone does not give rise to a reasonable inference of race or sex discrimination. After all, it is undisputed that Higgins never filed any other CRs before or after this incident, and it is also undisputed that Higgins supervised at least five other Black officers on the night in question. DSOF ¶ 18. The fact that Higgins did not subject other Black officers to negative treatment of course does not insulate Higgins from liability if he discriminated against Watkins. But in this particular case, it does not help support Watkins's case.

All in all, the Court is sympathetic to Watkins's perception of implicit bias on the part of Higgins, and the Court recognizes the difficulty of proving that a particular action was motivated by racism or sexism, where the decision-maker might not have even been actively thinking about race or sex, yet was still unconsciously driven by racist or sexist stereotypes. This is not to say that implicit bias can never be the basis for a Title VII claim. But in this particular case, Watkins has failed to offer enough concrete evidence to establish a causal connection between Higgins's alleged discriminatory attitudes toward Black women and his 2008 decision to initiate a CR against Watkins. Thus, the disparate-treatment claim based on the 2008 CR must be dismissed.

## 2. 2014 Suspension

Similarly, Watkins has failed to produce enough evidence to establish that the one-day suspension she received in 2014 was motivated by her race or sex. Just like above, she has failed to make out a *prima facie* case of discrimination, in large part because she has failed to identify any similarly situated individuals who were treated better than her (for instance, someone who did not receive a suspension despite being accused of similar conduct).

The City has also offered evidence that the 2014 suspension, which was reversed by the arbitrator in 2015, did not materially affect Watkins's chances at being promoted to detective. (To be clear, the issue here is whether the *suspension*, not the presence of the pending CR, affected Watkins's chances at promotion.) So, the question is whether Watkins has pointed to any evidence that, in the time span between when she received the suspension in 2014 and when it was removed from her record in 2015, she applied for a position and was denied because of the meritless suspension. And unfortunately, the record does not show that Watkins applied to any jobs between 2014 and 2015 that would have been affected by the suspension. Some of the applications she points to were definitively *after* the suspension had been removed, while she does not specify the timing of the other applications. *See* Pl.'s Resp. Br. at 11, 18; Pl.'s Resp. DSOF ¶¶ 58, 67.

But the even bigger problem with the 2014 suspension is that any potential discriminatory motive on the part of Higgins was insulated by multiple layers of independent review by other CPD supervisors—including the superintendent. Also,

unlike with the decision to file a CR itself, there is no evidence that Sergeant Higgins had anything to do with the decision to suspend Watkins, especially considering the undisputed fact that he retired from the department in 2010. In fact, the recommendation to suspend Watkins originated with Sergeant Kane, the IAD reviewer. And while, as discussed below, Watkins has provided ample evidence that Kane may have been motivated by *retaliatory* feelings, Watkins has not provided any evidence that Kane, Rivera, and McCarthy harbored discriminatory feelings toward Black women. For instance, Watkins does not point to any statements made by any of those decision-makers that would support an inference of race or sex discrimination.

Nor does Watkins try to argue that McCarthy, Rivera, *and* Kane were somehow influenced by Higgins's alleged biases. This is also known as the cat's paw theory of liability and will be discussed in more depth in the next section. But for now, suffice to say that "the cat's paw theory requires both evidence that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action, and evidence that the biased subordinate's scheme was the proximate cause of the adverse employment action." *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013). Here, even if Watkins had raised that argument, it would have been unsuccessful, because there is no evidence that Higgins was so influential throughout the multiple layers of review (especially after he retired in 2010), including all the way up to the superintendent, that a reasonable jury could infer that he was the proximate cause of McCarthy's decision to suspend Watkins.

For these reasons, the disparate-treatment claim based on the 2014 suspension must also be dismissed.

## B. Retaliation

Watkins also brings a retaliation claim premised on the one-day suspension she received in 2014. According to Watkins, she was only suspended because she had accused Sergeant Higgins of filing a false CR against her based on discriminatory motives. Pl.'s Resp. Br. at 21.

In order to establish retaliation, Watkins must prove that (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) the adverse action was motivated by the protected activity. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 718 (7th Cir. 2018). Ultimately, the plaintiff must show that her protected activity was the but-for cause of the adverse action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Here, there is no real dispute that Watkins's October 2008 memorandum complaining of discrimination counts as protected activity for purposes of her retaliation claim. But the City argues that the 2014 one-day suspension was not an "adverse employment action," and even if it were, that there was no causal connection with Watkins's 2008 complaint. Def.'s Br. at 12-13. The materially adverse action argument is unconvincing. But the Court ultimately agrees with the City on the causation point.

### 1. Materially Adverse Action

For what it is worth, Watkins has sufficiently shown that the suspension, even though it was only for one day, constituted a materially adverse action for purposes

of her retaliation claim. The City maintains that the suspension was not a materially adverse action and cites the same reasons mentioned above—that is, that the suspension did not affect Watkins's promotion chances. But this time, the City's argument fails because the standard for what constitutes an adverse action for purposes of a retaliation claim is different from the standard for a disparate treatment claim. Specifically, a materially adverse action for retaliation purposes "need not be one that affects the terms and conditions of employment." *Lewis v. Wilkie*, 909 F.3d 858, 867 (7th Cir. 2018). Rather, it just has to dissuade a reasonable employee from "engaging in the protected activity." *Id*. *See also Robertson v. Wis. Dep't. of Health Servs.*, 949 F.3d 371, 382 (7th Cir. 2020). Here, the City has provided no argument on how a one-day suspension (handed down by an employee's superiors) would *not* dissuade a reasonable employee from complaining about racial discrimination to those same superiors.

### 2. Causation

But Watkins cannot overcome the defense's causation argument. To be clear, Watkins has put forth enough evidence for a reasonable jury to infer that *Sergeant Kane* recommended the suspension due to retaliatory motives. But the problem is that Watkins has not offered similar evidence to explain why Rivera and McCarthy also recommended and implemented the suspension.

With regard to Kane, Watkins has provided just enough circumstantial evidence to permit a reasonable jury to infer a causal link between her 2008 memorandum and Kane's 2011 recommendation for suspension. It is true that there

was a three-year gap between the complaint and the recommendation. But the long passage of time between the protected activity and the adverse action is not dispositive, and "there are cases in which a plaintiff can demonstrate causation despite a substantial time lag." *Baines v. Walgreen Co.*, 863 F.3d 656, 666 (7th Cir. 2017) (cleaned up). *See also Malin v. Hospira, Inc.*, 762 F.3d 552, 560 (7th Cir. 2014) (retaliation charges may proceed in the face of long intervals when additional circumstances demonstrate that employer's acts may not be legitimate). And here, the length of the investigation actually cuts in favor of Watkins, because the City does not offer a good reason for Kane's year-and-a-half delay in conducting interviews of Watkins, White, and Higgins, or the year-and-a-half delay in putting together a summary report. To be clear, the length of the investigation itself is not an actionable basis for Watkins's retaliation claim. *See* R. 44, Order at 15-16. In other words, Watkins is not allowed to argue that the City retaliated against her by purposely prolonging the investigation (and therefore prolonging the stress of undergoing an investigation). But the length of the investigation by Kane can still serve as *evidence* that the ultimate suspension may have been driven by retaliatory motives.

In addition to the length of the investigation, Watkins has also provided evidence showing that Sergeant Kane harbored a retaliatory animus against her. According to Watkins, during one of her 2010 interviews with Kane, she accused Sergeant Higgins of being a racist. Watkins Dep. Tr. at 92:14-18. In response, Kane "was like you're defaming his reputation." *Id.* It is true that this exchange is not captured in the interview transcripts themselves, but given that those transcripts

were prepared by Kane herself, the Court concludes that Watkins has at least created a genuine dispute in material fact for purposes of the summary judgment stage. So, accepting as true Watkins's testimony that Kane was angry at her for "defaming" Higgins, then a reasonable jury could infer that Kane might have recommended suspension based on a desire to punish Watkins for making the discrimination allegation against Higgins. This inference of retaliatory motive is further strengthened by the fact that in Kane's October 2011 summary report of the investigation, she ultimately recommended a two-day suspension for Watkins, versus a one-day suspension for White, even though White was the one driving the patrol car on September 9, 2008, while Watkins was merely a passenger. *See* Investigation Records at DEF-WAT 000479. The only difference, according to Watkins, was that White "didn't speak up," whereas Watkins "had the audacity" to continue accusing Sergeant Higgins of racism. Watkins Dep. Tr. at 106:9-13. In that context, even though Watkins's suspension was eventually reduced from two days to one day, the fact that Kane initially recommended a disparate punishment supports an inference of retaliatory motive against Watkins.

But even if Kane acted with a retaliatory motive, Kane did not have the ultimate authority to unilaterally impose a suspension on Watkins. So, Watkins must also explain why Rivera and McCarthy decided to suspend her (or successfully invoke the cat's paw theory, as explained below). Here, the record shows that Sergeant's Kane's recommendations were reviewed by three other officers as part of the Command Review process, before going to IAD Chief Rivera and finally

Superintendent McCarthy, who was the ultimate decision-maker responsible for the suspension. DSOF ¶¶ 37-38. But unfortunately for Watkins, there is not enough evidence in the record to suggest that Rivera or McCarthy intended to retaliate against her.

Addressing McCarthy first, there is no dispute that he personally did not have a retaliatory motive against Watkins. Pl.'s Resp. DSOF ¶ 77. Rather, Watkins asserts a sort-of cat's-paw theory of liability against McCarthy. Cat's paw liability can "be imposed on an employer where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012) (cleaned up). Under this theory, "if a supervisor performs an act motivated by a discriminatory or retaliatory animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Hicks v. Forest Preserve Dist.,* 677 F.3d 781, 790 (7th Cir. 2012) (cleaned up). A supervisor's discrimination may be the proximate cause of an employment decision "where the party nominally responsible for a decision is, by virtue of [his] role in the [department], totally dependent on another employee to supply the information on which to base that decision." *Brewer v. Bd. of Trs. of Univ. of Ill.,* 479 F.3d 908, 918 (7th Cir. 2007).

So, even if McCarthy himself did not have retaliatory motives, Watkins could still prevail if she shows that a biased supervisor (so, either Kane or Rivera or both) exerted influence over McCarthy's decision. *Rozskowiak v. Vill. of Arlington Heights,*

415 F.3d 608, 613 (7th Cir. 2005). In other words, there are two possible ways for cat's paw liability to work here. First, Watkins can try to show that Kane managed to exert influence over both Rivera and McCarthy, such that Kane's retaliatory motives were the proximate cause of both Rivera's recommendation to suspend Watkins as well as McCarthy's implementation of that suspension. Alternatively, Watkins can try to show that Rivera was also retaliatory, and that Rivera's retaliatory motives were the proximate cause of McCarthy's implementation of the suspension. Under either theory, the evidence does not hold up.

First, addressing the argument that Rivera himself harbored a retaliatory motive, Watkins does not offer any evidence that Rivera intended to retaliate against her based on her 2008 discrimination complaint against Higgins. Unlike with Kane, for example, Watkins does not identify any statements by Rivera showing that he was angry at her for "defaming" Higgins, or that he was offended by the fact that she complained about discrimination. Rather, Watkins's argument is that Rivera "didn't do nothing. He just looked at it, I'm going to protect Sergeant Higgins so he won't be disciplined and we're not going to defame his reputation. The nerve of this young girl to get a CR number against him. That's all he did." Watkins Dep. Tr. at 100:18-24. But Watkins did not personally observe Rivera's review process, nor is there any indication that he simply rubber-stamped Kane's recommendations without looking at anything else (other than Watkins's unsubstantiated belief). Watkins's only real piece of evidence in support of a retaliatory motive is the outcome, that is, the fact that Rivera chose to sustain the CR against her even after three other Command

Reviewers chose not to sustain the CR. According to Watkins, the outcome demonstrates that Rivera did not conduct his own investigation, because if he had conducted his own investigation, he would have chosen to not sustain the CR.

But that fact standing alone is not enough for a reasonable jury to infer retaliation on the part of Rivera. For one, there is no indication that Rivera's review was deficient; Watkins does not allege that he was required to conduct his own first-level review of the allegations in the CR (for instance, by conducting his own interviews). And here, Rivera averred that he reviewed the existing investigative file materials, including the CRs themselves, Kane's interview transcripts, the printout of the dispatch audio transcript, and the recommendations of Kane and the other CCR reviewers. Rivera Decl. ¶ 22. Although Watkins disputes that Rivera looked at anything in the investigative file, she does not offer any factual support for her position (other than the fact that he came to a conclusion she disagreed with), so the Court must accept as true that Rivera at least looked at the files in the investigative record. And for what it is worth, the "not sustained" findings of the three CCR reviewers are not so clear-cut in themselves—one of them is based on the reviewer's impression that the pause before the dispatcher asked Watkins and White to copy was not as long as Kane thought it was; the other was based on the reviewer's conclusion that as long as Watkins and White eventually showed up at the scene, they should not be found to have failed to respond in general; and the third was simply an adoption of the first finding without further explanation. So it was not entirely unreasonable for Rivera to come to a different conclusion.

Even if Rivera was careless in going through the file, or was too harsh in judging the events of the burglary call, or was even flat-out incorrect in concluding that Watkins should have responded at 11:35 p.m. instead of 11:36 p.m., all of those things standing alone do not permit a reasonable jury to infer a retaliatory motive. If Watkins could have pointed to some evidence that Rivera was personally angry about the fact that she complained about discrimination, or that he believed discrimination complaints were a waste of time or unmeritorious or something like that, for instance, then she might have a claim. But there is no such evidence to move the scale in the direction of retaliation. Instead, it is undisputed that Rivera "recommended sustaining hundreds of CR's based on inattention to duty against PO's of both genders and different races." DSOF ¶ 44.

There are two other facts that Watkins asserts against Rivera, but neither is convincing. First, Watkins argues that Rivera "submitted fictitious documents" to McCarthy. Watkins Dep. Tr. at 101:9-20. But when asked what those fictitious documents were, Watkins just responded documents alleging that she "didn't go to the job." *Id*. Without more evidence, this sounds like Rivera just submitted documents describing Higgins's allegations against Watkins that she failed to respond to the burglary call on time. Even though the facts of that night are intensely disputed, it would not have been "fictitious" for Rivera to submit either the original allegations or his findings sustaining the allegations to McCarthy. Watkins's argument might be actionable, for instance, if Rivera had falsified the findings of the other CCR reviewers by changing them from "not sustained" to "sustained," for instance, to trick

McCarthy into thinking that this was a clear-cut case when in fact different reviewers had come to different conclusions. But Watkins does not provide any such evidence. The other piece of evidence Watkins cites against Rivera is the fact that he sent a "thank you letter" to Higgins after the resolution of the CR against Watkins. Pl.'s Resp. Br. at 6. But it is undisputed that Rivera did not personally know Higgins (or Watkins), DSOF ¶ 43, and nothing in the letter suggests otherwise. R. 103-2, Pl.'s Resp. DSOF, Exh. 1 at 16. This does not look like a personal thank-you letter; rather, it appears to be a typical IAD form letter meant to document the close of a complaint.

So, absent evidence showing that Rivera had a retaliatory motive when he sustained the CR and recommended suspension, that just leaves the question of whether Sergeant Kane somehow managed to influence *both* Rivera's decision and McCarthy's decision. Unfortunately, even though Watkins has provided sufficient evidence that Kane might very well have harbored retaliatory feelings toward Watkins, she has failed to provide any evidence showing that Kane's motives actually worked their way up the chain of command to also influence Rivera and McCarthy. Thus, the retaliation claim must also be dismissed.

If it is any consolation to Watkins, her potential damages on the retaliation claim would have likely been very limited. To the extent that she is arguing that the 2014 one-day suspension hampered her chances at being promoted to detective, the Court agrees with the City that, based on the existing record, no reasonable jury could find a connection between the suspension and her applications for detective. Thus, her damages would have been limited to any emotional-distress damages that came

with receiving the suspension as well as the costs of challenging that suspension in arbitration.

## IV. Conclusion

For the reasons explained above, the City's motion for summary judgment is granted. Watkins's motion to file a sur-reply, R. 115, is denied. The status hearing of April 1, 2020 is vacated, and the Court will enter final judgment.

ENTERED:


    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge


DATE: March 26, 2020